Filed 8/28/20  Cal. Dept. of Industrial Relations etc. v. Cal. Occupational Safety etc. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF INUSTRIAL RELATIONS, DIVISION OF OCCUPATIONAL SAFETY AND HEALTH,<br><br>　　　Petitioner and Respondent,<br><br>v.<br><br>CALIFORNIA OCCUPATIONAL SAFETY AND HEALTH APPEALS BOARD,<br><br>　　　Respondent,<br><br>BRAGG COMPANIES,<br><br>Real Party in Interest and Appellant. | A158500<br><br>(Alameda County Super. Ct. No. HG18930741) |

　　　Real party in interest Bragg Companies, doing business under the name of Bragg Crane Service (Bragg) appeals after the trial court granted the petition for writ of mandate filed by petitioner and respondent California Department of Industrial Relations, Division of Occupational Safety and Health (Division), ordering respondent California Occupational Safety and Health Appeals Board (Board) to set aside a portion of its decision after reconsideration in

1

administrative proceedings against Bragg regarding workplace violations that resulted in a crane accident.

On appeal, Bragg contends the trial court incorrectly interpreted the term "provided" in California Code of Regulations, title 8, section 4951[1] to mean that a swing lock or swing brake must not only be *provided* by the employer, but must also be *used* by the employee when necessary to prevent rotation during the operation of a hydraulic crane. The Board concurs in Bragg's argument that the court erred in its interpretation of the meaning of the term "provided." We agree with Bragg and the Board, and conclude the court misconstrued the meaning of the term "provided" in section 4951. We shall therefore reverse the court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In June 2016, Bragg was providing crane services as a subcontractor at a former ExxonMobil facility in Torrance, hoisting dismantled pieces of a reactor and regenerator. On June 20, the operator of a hydraulic crane picked up a 78,000-pound piece of equipment (the load) off the ground, swung it to the rear, and started to move the crane backwards. Although the crane was equipped with a swing lock, the crane operator did not engage it during this pick and carry operation. In addition, before walking the crane backwards, employees retracted the outriggers, which help keep the load stable. No taglines—restraints used to prevent a load from rotating while the

---

[1] All further regulatory section references are to title 8 of the California Code of Regulations unless otherwise indicated.

Section 4951 provides: "Unless swing drive mechanism is of a self-locking type, a swing lock or swing brake capable of preventing rotation under normal working conditions shall be provided."

2

load is moving—were being used. As the crane moved backwards, the load started to swing and hit a scaffold structure, and the crane tipped over.

On June 21, 2016, the Division opened an inspection, which resulted in the issuance of two citations against Bragg. Citation 1, Item 1 alleged a general violation of section 4951 for failure to engage the crane's swing lock while walking the crane with a suspended load. Citation 1, Item 2 alleged a general violation of section 4992, subdivision (b) for failure to use taglines to prevent rotation of the suspended load while walking the crane. Citation 2 alleged a serious violation of section 4994 for failure to leave the outriggers extended while walking the crane with a suspended load.

Bragg appealed the citations, and a hearing was held before the Board. On January 25, 2018, an administrative law judge (ALJ) affirmed all of the citations against Bragg.

Bragg filed a petition for reconsideration with the Board, and on November 2, 2018, the Board issued a decision after reconsideration in which it upheld Citation 1, Item 2 and Citation 2. However, it vacated Citation 1, Item 1 because it concluded Bragg *had* provided the crane with a swing lock capable of preventing the load's rotation under normal working conditions, as required by section 4951.

The Division filed a petition for writ of mandate in the trial court, challenging the Board's interpretation of the requirements of section 4951 and requesting reinstatement of Citation 1, Item 1. On September 6, 2019, the court entered an order granting the Division's petition for writ of mandate and ordered the Board to set aside the portion of its decision vacating Citation 1, Item 1.

3

On October 1, 2019, Bragg filed a notice of appeal.

## DISCUSSION

The California Occupational Safety and Health Act of 1973 (Act) was "enacted for the purpose of assuring safe and healthful working conditions for all California working men and women by authorizing the enforcement of effective standards . . . ." (Lab. Code, § 6300.) The terms of the Act " 'are to be given a liberal interpretation for the purpose of achieving a safe working environment.' " (*Bendix Forest Products Corp. v. Division of Occupational Safety & Health* (1979) 25 Cal.3d 465, 470; accord, *Carmona v. Division of Industrial Safety* (1975) 13 Cal.3d 303, 313 (*Carmona*).)

The Division "shoulders primary responsibility for administering and enforcing the [Act.] It does this through investigating workplaces and enforcing occupational safety and health standards. (Lab. Code, §§ 6309, 6313, 6314.) Many of these standards, commonly referred to as safety orders, are codified at title 8 of the California Code of Regulations." (*Rick's Electric, Inc. v. California Occupational Safety & Health Appeals Board* (2000) 80 Cal.App.4th 1023, 1026 (*Rick's Electric*).) The Board is an independent adjudicatory agency responsible for, inter alia, resolving employers' appeals from citations issued by the Division for safety violations. (*Rick's Electric*, at p. 1027; Lab. Code, § 148.)

### I. *Standard of Review and Rules of Regulatory Interpretation*

"The interpretation of a regulation, like the interpretation of a statute, is, of course, a question of law [citations], and while an administrative agency's interpretation of its own regulation obviously deserves great weight [citations], the ultimate resolution of such legal

4

questions rests with the courts. [Citations.]" (*Carmona, supra*, 13 Cal.3d at p. 310; accord, *Rick's Electric, supra*, 80 Cal.App.4th at pp. 1033–1034 [" 'An agency's expertise with regard to a statute or regulation it is charged with enforcing entitles its interpretation of the statute or regulation to be given great weight unless it is clearly erroneous or unauthorized' "].) " 'The Board is one of those agencies whose expertise we must respect. [Citation.]' [Citation.] However, '[a]n administrative agency cannot alter or enlarge the legislation, and an erroneous administrative construction does not govern the court's interpretation of the statute.' [Citation.]" (*Rick's Electric*, at p. 1034.)

"In determining the issuing agency's intent, we look first to the language of the regulation itself. [Citations.] ' "If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the [agency] . . . . [Citation.]" "But the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a [regulation] comports with its purpose. . . ." [Citation.] Furthermore, " 'where a word of common usage has more than one meaning, the one which will best attain the purposes of the [regulation] should be adopted, even though the ordinary meaning of the word is thereby enlarged or restricted and especially in order to avoid absurdity or to prevent injustice.' " ' [Citations.] Moreover, '[w]e do not construe a regulation in isolation, but instead read it with reference to the scheme of law of which it is a part, so that the whole may be harmonized and retain effectiveness.' [Citations.]" (*Department of Industrial Relations v. Occupational Safety & Health Appeals Board* (2018) 26 Cal.App.5th 93, 101.) Finally, " [w]hen attempting to ascertain the ordinary, usual meaning

of a word, courts appropriately refer to the dictionary definition of that word.' [Citations.]" (*Heritage Residential Care, Inc. v. Division of Labor Standards Enforcement* (2011) 192 Cal.App.4th 75, 83, quoting *Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121–1122.)

## II. *Meaning of "Provided" in Section 4951*

Again, section 4951, a safety order that applies to hydraulic cranes and excavators, provides: "Unless swing drive mechanism is of a self-locking type, a swing lock or swing brake capable of preventing rotation under normal working conditions shall be provided."

The sole issue in this case is whether the term "provided" in section 4951 should be interpreted to mean that a swing lock or swing brake must be both provided *and used* to satisfy the regulation's mandate. The Board and the trial court differed in their interpretations of section 4951.

In its decision after reconsideration, the Board found in favor of Bragg on this question, after first noting that there was no dispute that "the crane at issue had a swing lock" and that the operator credibly testified that "he did not engage it during the operation." In rejecting the Division's argument that "the citation should be affirmed because the swing lock was not engaged while the crane was working under normal working conditions," the Board found that section 4951 "does not require engaging the swing lock or swing brake. An employer complies with section 4951 so long as it provides its employees with a crane or excavator equipped with a swing lock capable of preventing rotation under normal working conditions. Such an interpretation is consistent with the regulation's plain text . . . . Therefore, [Bragg] did

6

not violate section 4951 because the crane it provided to its employees was equipped with a swing lock." (Fn. omitted.)

In its order granting the Division's petition for writ of mandate, the trial court ordered the Board to "reconsider its Decision After Reconsideration in light of this court's ruling that the term 'provide' in section 4951 . . . infers that a swing lock and swing brake shall not only be provided, but also used when necessary to prevent rotation. The court also deemed *Hughes Aircraft Company Space & Communications Group* [(Cal. O.S.H.A., Jan. 26, 1984, No. 78-R4D1-258) [decision after reconsideration] 1984 WL 183091 (*Hughes Aircraft*)] the controlling precedent the Board must follow in its interpretation of the term 'provide' in Section 4951 . . . ."

Based on Board precedent, the plain meaning of the term "provided," and the scheme of law of which section 4951 is a part (see *Department of Industrial Relations v. Occupational Safety & Health Appeals Board*, *supra*, 26 Cal.App.5th at p. 101), we conclude the Board correctly found that the word "provided" in section 4951 does not require an employer to ensure that the provided swing lock is also *used* during normal working conditions. Rather, as we shall explain, this safety order is satisfied when an employer equips a hydraulic crane or excavator with a swing lock that is fully functional and available for use when needed in the normal course of work.

Prior Board decisions support its interpretation of the term, "provided" as used in section 4951. For example, in the 43-year-old decision of *R.E. Williams & Sons, Inc.* (Cal. O.S.H.A. May 10, 1977, No. 76-R4D4-1065) [decision after reconsideration] 1977 WL 26760 (*R.E. Williams & Sons, Inc.*) the Board upheld a citation based on a

7

violation of former section 1637, subdivision (1) (now § 1637, subd. (n)(1)), which provides: "A safe and unobstructed means of access, such as a walkway, stair, or ladder shall be provided to all scaffold platforms." Although a ladder had been supplied to the job site, it was located in the basement rather than set up to provide access to the scaffold platform. The Board found that the safety order was violated "when, as in this case, such ladder is not in place to provide safe and unobstructed means of access. Safety equipment which is merely brought to a job site does little to promote employee safety if such equipment is not utilized for the purpose for which it is intended." (*R.E. Williams & Sons, Inc.*, at p. *1.)

In a much more recent decision, *Stanislaus Food Products Co.* (Cal. O.S.H.A., Jan. 30, 2015, No. 13-R2D4-572) [decision after reconsideration] 2015 WL 10058944 (*Stanislaus Food Products Co.*), the Board relied on *R.E. Williams & Sons, Inc.* and other prior decisions in construing the meaning of "provide" in another safety order, section 3314, subd. (e), which provides in relevant part: "The employer shall provide accident prevention signs, tags, padlocks, seals or other similarly effective means which may be required for cleaning . . . ." The citation alleged that the employer had failed to provide locks and hardware, required for cleaning, to a sanitation crew leader. (*Stanislaus Food Products Co.*, at p. *2.)

After discussing the prior decisions, the Board in *Stanislaus Food Products Co.* concluded that they "establish the proper approach for construing a safety order that requires an employer to 'provide' safety equipment or supplies to employees. To comply, the employer must make the required supplies and equipment available to employees at

8

the point of employee use, and the supplies/equipment must be available prior to the time of their use, so that employees may use them when they are needed." (*Stanislaus Food Products Co.*, *supra*, 2015 WL 10058944, at p. *4.) The Board relied on this precedent to find that the employer in that case "did not 'provide' to its crew leader Hernandez locks that might be needed during the cleaning of conveyor belts. . . . Although locks were available to Hernandez and to other crew leaders in a supply room, they were not available to Hernandez (or other employees) at the point of employee use, prior to the daily 90-minute clean-up period." (*Id.* at p. *5; accord, *Milad & Sons Corp.* (Cal. O.S.H.A., Nov. 1, 2016, No. 1064349) [ALJ decision] 2016 WL 7637261, pp. *2–*3 [evidence was sufficient to show that employer had violated section 4530, subd. (a)(3), which required that main shutoff valves on bakery ovens "shall be provided to permit turning off the fuel or steam in case of an emergency," because, "[a]s in *R.E. Williams* [*& Sons, Inc.*], the safety equipment (the shutoff valve) was at the site but was not promoting safety because it could not be utilized for the purpose for which it was intended," given that it was obstructed by a large table and therefore inaccessible]; see also *Keir Krane, Inc.* (Cal. O.S.H.A., Dec. 30, 1992, No. 91-R2D4-863) [decision after reconsideration] 1992 WL 528567, pp. *2–*3 [decision cited by Board in this case, in which it found that a safety order requiring that "[a]n effective, audible warning and operating signal device shall be provided on the outside of a crane" (§ 4936) was satisfied since crane was equipped with a working horn, even though employee was unaware of horn button's presence and a second horn button did not work].)

9

These decisions establish that the Board has consistently interpreted the term "provide" in safety orders like the present one to mean that the employer must ensure that a required safety measure or device is installed or in place, fully functional, and available for use by employees when it is needed.  (See, e.g., *Shimmick Construction Co. & Obayashi Corp.* (Cal. O.S.H.A. Nov. 20, 2008, No. 06-R5D3-1136) [decision after reconsideration] 2008 WL 5209689, p. *9 ["the Board has held that when a safety order requires employers to provide a specific safety measure or device, the device must perform its designed function—a horn must work[,] a load indicator device must be connected, etc."]; compare *Levy Premium Foodservice Limited Partnership dba Levy Restaurants* (Cal. O.S.H.A., Aug. 25, 2014, No. 12-R1D5-2714) [decision after reconsideration] 2014 WL 11706517, pp. *3–*5 [Board found that employer violated both section 3653, subd. (a)—"Seat belt assemblies shall be provided and used on all equipment where rollover equipment is installed"—and section 3650, subd. (t)(33)—"When provided by the industrial truck manufacturer, an operator restraint system such as a seat belt shall be used"—where evidence showed that forklift operator was not wearing provided seatbelt while operating forklift].)

The Board's decision in *Hughes Aircraft*, on which the Division relies in this case and which the trial court found was "controlling precedent" in its interpretation of the term "provided" in section 4951, is not in conflict with the decisions just discussed.  In that case, the Board addressed whether the evidence was sufficient to establish that the employer, a manufacturer of various products used in the space and communications industry, had violated section 3303, which requires

10

that "wherever there is danger of injury from flying particles or substances, adequate shields, screens, chip guards, or enclosures shall be provided . . . . When it is not possible to provide such guards, employees subject to such hazards shall be protected by the use of personal protective equipment." (*Hughes Aircraft, supra,* 1984 WL 183091, at p. *1.) During an inspection, the Division's safety engineer observed several employees working at milling machines and engine lathes wearing goggles without side shields to protect from flying chips and also saw chips flying 20 feet from one machine, as well as chips near a workbench. He saw two screens, meant to guard employees from the hazard of flying particles, on the premises, but they were not installed between the machines. (*Id.* at pp. *1–*2.)

In its decision, the Board stated: "Although Employer had screens on its premises, they were not in use. Employer's argument that it 'provided' screens does not establish compliance with section 3303. It is implicit in the cited safety order requiring that an employer provide safety devices, that the employer must see that the safety devices are used by the employees. Employer has not shown that its employees acted independently in not using the screens or goggles with side shields." The Board therefore found the evidence sufficient to establish a violation of section 3303. (*Hughes Aircraft*, *supra*, 1984 WL 183091, at p. *2.)

The Division maintains that in this case, the Board ignored its own precedent when it interpreted the word "provided" differently than it did in *Hughes Aircraft*, and that it "should have found that the employer violated the regulation when the safety device [here, the swing lock] was not engaged, like it did in *Hughes Aircraft*" with

11

respect to the screens that were present on the premises but not being used.

We do not agree with the Division that the Board's interpretation of "provided" in the present case contradicts its 1984 decision in *Hughes Aircraft*. There, the Board did use language—"the employer must see that the safety devices *are used* by the employees"—that might at first glance seem to support the Division's interpretation of "provided" as meaning provided *and* used. (*Hughes Aircraft, supra,* 1984 WL 183091, at p. *2, italics added.) However, notwithstanding this cited language, the Board's interpretation of that term in *Hughes Aircraft* was in fact consistent with the other Board decisions discussed above: the failure to ensure that the screens were installed between the machines before they were needed so that they would be capable of providing protection from flying chips when the machines were in use meant that they were not available for employees' use, in violation of section 3303. (See *Hughes Aircraft*, at p. *2[2]; accord, *Stanislaus Food Products Co.*, *supra*, 2015 WL 10058944, at p. *4 [to "provide" safety equipment, employer must make such equipment "available to employees at the point of employee use, and the supplies/equipment must be available prior to the time of their use, so that employees may use them when they are needed"].)

The Division also relies on *McCurdy Roofing* (Cal. O.S.H.A., Nov. 25, 1977, No. 93-R1D3-3117) [decision after reconsideration] 1997 WL

---

[2] The violation was also based on evidence that the alternative permissible means of protecting employees under section 3303—"use of personal protective equipment"—was not met since the goggles employees were wearing did not have side shields to protect them from the flying chips. (*Hughes Aircraft, supra,* 1984 WL 183091, at pp. *1– *2.)

736098 (*McCurdy Roofing*), in support of its interpretation of "provided." In that decision, the Board found that the employer violated section 1520, which provides: "Hand protection shall be required for employees whose work involves unusual and excessive exposure to . . . burns . . . ." The Board found that, although the employer had given the burned employee gloves, the employee was not protected under the safety order unless the employer also required their use. (*McCurdy Roofing*, at p. *2.) The Board explained that the term "required" in section 1520 "more emphatically establishes a duty to ensure that the equipment is used than the term 'provided,' which the Board in *Hughes* [*Aircraft*] construed as establishing a duty to ensure that safety devices were used, not just made available." (*McCurdy Roofing*, at p. *3.)

The language in question in *McCurdy Roofing*—that the regulation requires that the gloves be *used*, not just available by the employer—is not, in context, contradictory to the other Board precedent discussed or to the Board's interpretation in this case. As is the case generally with personal protective equipment, to be effective against the harms described in the safety order at issue in *McCurdy Roofing*, the gloves must always be worn by employees whose work excessively exposes them to burns. *McCurdy Roofing* thus reflects the Board's determination, as already discussed, that when a safety order states that certain equipment shall be "provided" (or, in the case of *McCurdy Roofing*, "required"), such language means that, just as a ladder must be set up to provide access to a scaffold platform (*R.E. Williams & Sons, Inc.*), and locks that might be needed while cleaning conveyor belts must be available at the point of employee use (*Stanislaus Food*

13

*Products Co.*), and screens must be installed between machines or protective safety goggles must be worn where employees will be working and chips will be flying (*Hughes Aircraft*), gloves must be worn in the situation described in section 1520, so that they are available to provide the protection needed while the employee is doing the job for which the protection is required. Hence, the decision in *McCurdy Roofing* does not contradict the Board's decision in the present case.[3]

Finally, the Board states that its "position does not mean [Bragg] should not have used the swing lock or swing brake. But, it does mean that the regulation the Division cited [Bragg] under is not concerned with use of that device. Section 4951's terms are satisfied so long as the crane is equipped with the device, the device is functioning, and it is available for use."

We are mindful of the importance of "liberally" interpreting safety orders " 'for the purpose of achieving a safe work environment.' " (*Bendix Forest Products Corp. v. Division of Occupational Safety & Health, supra*, 25 Cal.3d at p. 470.) Nevertheless, it is essential that employers be cited only under safety orders they have in fact violated. Here, there may have been other regulations under which the Division could have properly cited Bragg for its employee's failure to engage the swing lock during the travel portion of its pick and carry operation. However, it failed to do so. (See *Keir Krane, Inc., supra*, 1992 WL 528567, at p. *3 ["Employer's failure to instruct the crane operator concerning the horn button change may have violated other safety

---

[3] We note that a swing lock on a crane is also different from many other safety measures in that it must always be installed, functional, and available for use, but is meant to be engaged only when necessary to avoid rotation of the load.

orders (e.g., those requiring safety instruction for employees), but it is not evidence that the horn itself was ineffective"]; *PCC Rollmet, Inc.* (Cal. O.S.H.A., Aug. 15, 2017, No. 15-R3D1-3653) [decision after reconsideration] 2017 WL 3613725, p. *3 [noting that while another safety order might apply, Division had failed to demonstrate a violation of safety order for which employer was cited and Board "decline[d] to sua sponte engage in a post-submission amendment of the Division's citation"].)

In conclusion, we concur in the Board's finding that "section 4951 'does not require engaging the swing lock or swing brake. An employer complies with section 4951 so long as it provides its employees with a crane or excavator equipped with a swing lock capable of preventing rotation under normal working conditions." This interpretation, which is entitled to great weight, is consistent with the plain meaning of the word "provided," the scheme of law of which this regulation is a part, as well as Board precedent interpreting the same term in comparable safety orders. (See *Department of Industrial Relations v. Occupational Safety & Health Appeals Board*, *supra*, 26 Cal.App.5th at p. 101; *Heritage Residential Care, Inc. v. Division of Labor Standards Enforcement*, *supra*, 192 Cal.App.4th at p. 83; *Rick's Electric*, *supra*, 80 Cal.App.4th at pp. 1033–1034.) In this case, it is undisputed that a swing lock was installed on the crane involved in the accident, that it was fully functional, i.e., "capable of preventing rotation under normal working conditions" (§ 4951), and that it was available for use by the crane operator as needed. No violation of section 4951 was shown. We will therefore reverse the trial court's order granting the Division's petition for writ of mandate.

**DISPOSITION**

The judgment is reversed and the matter is remanded with directions to the trial court to prepare a new judgment denying the Division's petition for writ of mandate, consistent with this opinion. The Division shall pay the costs on appeal of Bragg and the Board. (See Cal. Rules of Court, rule 8.278(a)(2).)

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Stewart, J.


*California Department of Industrial Relations, Division of Occupational Safety and Health v. California Occupational Safety and Health Appeals Board; Bragg Companies, RPI* (A158500)

17